Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | George M. Marovich | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5867 | **DATE** | 8/18/2003 |
| **CASE TITLE** | Kampinen vs. Martinez, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** The Court grants defendants James Love, Peter C. Arndt, David J. Cho and Thomas W. Tilton's motion for summary judgment.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| ✓ | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

courtroom deputy's initials: JD

date docketed: AUG 19 2003

Document Number: 128

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DIANNE C. KAMPINEN,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　　)
　　v.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
Individuals of the Chicago　　　　　　)
Police Department, JUDE　　　　　　　 )　00 C 5867
MARTINEZ, LUCIO M. MARTINEZ,　　　　 )　Judge George M. Marovich
JAMES LOVE, JANE GOULD, and　　　　　)
JOHN GUARNIERI, and Individuals　　　)
of the United States Secret　　　　　 )
Service, DAVID J. CHO, PETER C.　　　)
ARNDT, and THOMAS W. TILTON　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　　　)

DOCKETED
AUG 1 9 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff Dianne C. Kampinen ("Kampinen") filed a pro se third-amended Complaint against Individuals of the Chicago Police Department, Jude Martinez, Lucio M. Martinez, James Love ("Love"), Jane Gould ("Gould") and John Guarnieri ("Guarnieri"), and Individuals of the United States Secret Service, David J. Cho ("Cho"), Peter C. Arndt ("Arndt") and Thomas W. Tilton ("Tilton"), alleging civil rights violations under the Civil Rights Act, 42 U.S.C. § 1983, a violation of her Fourth Amendment right to be free from unreasonable searches and seizures and false imprisonment/false arrest. Love, Cho, Arndt and Tilton move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the Court grant Love, Cho, Arndt and Tilton's motions for summary judgment.



## BACKGROUND

Unless otherwise noted, the following facts are not in dispute. In September 1998, Kampinen, employed as a security officer by SDI, was assigned to 212 West Van Buren Street in Chicago. On the morning of September 25, 1998, she heard on the radio that President Clinton was scheduled to attend a fundraiser for Glenn Poshard, a Democratic candidate for governor of Illinois, around noon at the Mercantile Exchange (the "Merc"). Later that morning, Kampinen learned from a UPS driver that the loading dock at the Merc was going to be closed during the middle of the day for maintenance. Kampinen interpreted this to mean, as evidenced by language written in her journal, that the Merc personnel were "not revealing that [the former] President will be there today." (Def. Love's 56.1(A)(3) Stmt. of Uncontested Facts Ex. B(1).)

Around noon, Kampinen walked to the Merc wearing her security uniform, which consisted of black pants, a white military-type shirt, black shoes, black belt, black tie, a star-shaped badge reading State of Illinois and a name tag reading Officer D. Kampinen. The uniform did not have SDI insignia on it. Upon arrival at the Merc, Kampinen passed through the lobby and proceeded up the escalator to where a private club called the Mercantile Exchange Club (the "Merc Club") is located. At the top of the escalator, about fifteen feet away, there was a magnetometer. Kampinen states that this area looked like it did during a normal lunch hour, except for the magnetometer.

Kampinen walked up to the magnetometer and approached a man whom she believes was a Secret Service Agent. She explained that she was on her lunch break and asked if she could walk down the hall. After he scanned her person with a metal detection wand, she passed through the magnetometer and proceeded down the hall.

Kampinen approached the Merc Club receptionist, who was sitting at an entry desk. The former President was in the Club. Kampinen began talking to the receptionist when a member of the Merc security staff walked over to her and asked her whether she was supposed to be there. Kampinen responded that she was on her lunch break from her job and that the man at the magnetometer machine let her walk down the hall. The security agent stated that he did not think that she was supposed to be in that area, at which point, Kampinen started to leave.

When Kampinen walked back through the magnetometer, a woman approached her and asked her if she would step aside to answer some questions. Kampinen agreed. About a minute later, a male secret service agent approached her and asked if she would accompany him into a room. Kampinen was led to a security room and asked to be seated. There were approximately five additional people in this room. Kampinen was then asked her birth date, where she worked, along with various other questions. She could not produce identification. She was then left alone while the men in the room made telephone calls.

After ten minutes, Guarnieri entered the room and asked her some questions regarding an arrest for criminal trespass to land that occurred at the Ritz Carlton in 1989. Shortly thereafter,

Arndt entered the room and began questioning her, at which point, Kampinen stated that it was getting late and she needed to return to work because she only had a half hour lunch. She was informed that they had already contacted her boss. Kampinen replied, "it was the Secret Service that called my boss, then it's probably okay if I will be late." (Kampinen Dep. at 103.) Sometime thereafter, Kampinen stated to the agents in the room that she realized that anyone could be wearing a security guard uniform but that her SDI identification card was in her bag at 212 West Van Buren.

After about an hour and a half of waiting in the security room, Kampinen was then asked to accompany Cho and Love to 212 West Van Buren to obtain her I.D. Upon arrival, Kampinen led them back to where her belongings were and pointed to her backpack located on a shelf. Cho removed the backpack, and, according to Cho, asked permission to look inside. Kampinen does not remember being asked permission but she "assume[s] that he asked [her] because [she] was totally amenable to having him look in it." (Kampinen Dep. at 126-27.) In addition to her identification, the backpack also contained various newspaper clippings. Several of the articles were about President Clinton and one was a New York Times article about how to obtain a Secret Service case study, which examined characteristics of assassins. Kampinen tried to explain why she had this material but Cho interrupted Kampinen by stating that he would like to see her apartment. Kampinen responded by asking why. (Pl's Third Amended Compl. ¶ 13.)

Meanwhile, Love noticed a diary on the shelf and asked Kampinen for permission to look at it, which she provided. Her diary, which conveyed a strong dislike of Democrats throughout, contained detailed information regarding the former President's visit that day and her receipt of the Secret Service case study, the same study that was described in the New York Times article. After reading some of the entries, Love handed the diary to Cho and advised him to read the entries that he had seen. At this point, Kampinen stated that the diary was private. Love then closed the diary and kept it.

Cho left to make a phone call and approximately forty-five minutes later, Tilton arrived and introduced himself to Kampinen as "squad leader". He asked her some questions about her background. According to Kampinen, Tilton told her that she only had two options, since the Merc had already signed a criminal trespass complaint against her. She could: (1) allow them to go to a judge to get a warrant for her apartment which would result in her being hospitalized for 72 hours; or (2) go with the agents to see a doctor (only the agents would receive the report) and then allow them to search her apartment. (Pl's Third Amended Compl. ¶ 14.) Kampinen began to question Tilton about these options when she noticed Gould, a plainclothes Chicago police officer, who announced "we'll get a wagon." (Pl's Third Amended Compl. ¶ 16.) At this time she was handcuffed. About ten minutes later, Gould escorted Kampinen from the building.

Kampinen was taken to the Maxwell police station, located at 11th and State Street, for processing. During that time she was

5

provided a phone call. Next, she was transported by Gould to 1121 S. State, the women's central detention. At 1121 S. State, Kampinen was fingerprinted, photographed and provided an I-Bond for the criminal trespass charge.[1] Then, Kampinen was transported back to the Maxwell Street Station where she remained until about 3:30 a.m.

Kampinen, still handcuffed, was then led to a police car by Gould, Cho and Tilton. They and another police officer drove to Northwestern Memorial Hospital Psychiatric Ward ("Northwestern"). At Northwestern, Kampinen was taken to a waiting area, where she remained with Cho and Gould, while Tilton met with members of the hospital staff. After about an hour and a half, Kampinen's handcuffs were removed and the agents and officers left Northwestern.

Members of the hospital staff escorted Kampinen to a room where she met a crisis worker named Michele. After Kampinen and Michele conversed for twenty to thirty minutes, they were joined by a psychiatrist. That meeting lasted about an hour longer, during which Michele asked Kampinen questions about herself. Near the end of the meeting, Michele and the psychiatrist asked Kampinen to sign a form which would effectuate her voluntary

---

[1] Although Patrick Sheahan, an employee in the Security Department of the Merc, states that he never signed the criminal trespass complaint which bears his signature, he remembers discussing the situation with a member of the Chicago Police Department and acknowledges that in his experience, Chicago police will sometimes ask a complainant to authorize by telephone the filing of a complaint, and then have the complainant sign the actual complaint document upon attending the first court date. (Sheahan Dep. at 3.)

commitment to the hospital. According to Kampinen, the psychiatrist told her that "the Secret Service procedure is such" that he strongly advised her to sign the voluntary admission form. (Kampinen Dep. at 308-09.) After reading the form and having Michele explain it to her, Kampinen signed the form and was voluntarily admitted to Northwestern's Psychiatric Ward. Kampinen later discovered, when reviewing her medical records, that it appeared the agents furnished a petition for involuntary "emergency admission by certificate" to Northwestern, presumably in the event that Kampinen refused to voluntarily commit herself.

On September 28th, a doctor at Northwestern told Kampinen that he was going to release her from the hospital the following day, and that she would meet with the Secret Service that afternoon. At around 4:00 p.m. that day, Kampinen met with Tilton and Arndt in a conference room at Northwestern, along with a police officer, a Northwestern crisis worker, and the charge nurse for the ward where Kampinen was staying. During this meeting, Kampinen was asked for permission to search her apartment and, specifically, to sign a consent form. Kampinen notes in her deposition that Tilton and Arndt "were extra nice" and "very charming" during their visit. (Kampinen Dep. at 370-71.) After reading the consent form and after some thought, Kampinen signed it adding a notation that states "I and an attorney will be present during this search. DK." (Kampinen Dep. at 378.) She also agreed to have Secret Service agents pick her up at the hospital after she was discharged the next day.

7

Later that evening, she called and spoke to an attorney but she was not able to secure counsel for the search of her apartment.

The next morning at around 9:30 a.m., Kampinen was picked up by Arndt and Secret Service Agent Mark Breuker ("Breuker") and driven to her home. When they arrived at her apartment, Kampinen unlocked the door and allowed the agents to enter. No one except the agents and Kampinen were present for the search. Arndt and Breuker searched her entire apartment. As the agents were searching, Kampinen unlocked a trunk and a plastic lock box so that the agents could search them. Kampinen claims that her civil rights were violated under § 1983, her Fourth Amendment rights were violated to be free from unreasonable search and seizures, and she was falsely imprisoned and falsely arrested.

DISCUSSION

I. Summary Judgment Standards

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Courtney v. Biosound, 42 F.3d 414, 418 (7th Cir. 1994).

II. Fourth Amendment Claims

Three categories of interaction exist between police and citizens, only two of which implicate the Fourth Amendment. United States v. Williams, 945 F.2d 192, 195 (7th Cir. 1991). Interactions which implicate the Fourth Amendment include arrests and investigative detentions or Terry stops. Id. For an arrest, the Fourth Amendment requires probable cause that the potential defendant has committed a crime. Id. For an investigative detention, the Fourth Amendment only requires that an officer have "specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime." United States v. Johnson, 910 F.2d 1506, 1508 (7th Cir. 1990). The final category involves no restraint on a citizen's liberty, and is characterized by an officer seeking a citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment. Id. In this type of police/citizen encounter, no degree of suspicion is required. Id. at 1508-09.

A. Mercantile Exchange

After passing various security checkpoints and becoming increasingly closer to the former president, Kampinen was asked if she would mind being taken to the security room to answer a few questions. When she could not produce identification and upon her suggestions, the officers accompanied Kampinen to her place of employment. Kampinen claims that this detention at the

Merc violated her Fourth Amendment right to not be detained unreasonably and without the requisite cause.

The test to determine when a consensual encounter becomes an investigative detention is whether a reasonable person would not feel free to disregard the police and go about his business. Florida v. Bostick, 501 U.S. 429, 434 (1991). The Seventh Circuit has construed this test as follows:

> If in the totality of the circumstances, a reasonable person would not believe that his freedom of movement is restrained, or believes that he remains at liberty to disregard a police officer's request for information, a seizure has not occurred.

U.S. v. Dyer, 784 F.2d 812, 815 (7th Cir. 1986)(citations omitted).

The Court applies this test not only to classify the initial encounter but also throughout any consensual stop to determine if the circumstances of the situation change in a manner which escalates the encounter to the level of an investigative detention. Id. at 197. Therefore, this Court must first decide whether the initial encounter was consensual and second decide whether the encounter ever escalated into a seizure.

This encounter was consensual, the purpose of which was only to ask a few questions to dispel the Secret Service's suspicions of Kampinen. It was not until they discovered her lack of identification and her criminal background that they required Kampinen to be detained further. However, even assuming, that

the taking of Kampinen to a security room would be classified as an investigative detention, in which a reasonable person would not feel free to leave, the agents had reasonable suspicion to detain Kampinen. Kampinen had been dressed in a security guard uniform, possibly allowing her to pass the security points that she would not otherwise pass. In addition, Kampinen did not have any identification on her. The national security, and in turn, the safety of the President, is not taken lightly. Under the circumstances, it was more than reasonable for Kampinen to be detained at the Merc.

B.   212 West Van Buren

Next, the officers accompanied Kampinen to 212 West Van Buren, her place of employment, to obtain her identification. Kampinen consented to a search of her belongings, whereupon a diary with excerpts detailing the former President's arrival, along with many excerpts exhibiting an obvious dislike of Democrats. In addition, among her belongings, she possessed an article discussing a study done by the Secret Service on characteristics of assassins. Kampinen was then arrested. Kampinen claims that this was an unlawful arrest and in turn, violated her Fourth Amendment right to be free from arrest without probable cause. Taking all that was discovered at 212 West Van Buren, together with what was already known from the Merc, the Court cannot find that the agent and officer lacked probable cause to arrest her. Additionally, the Merc had authorized that a criminal trespass complaint be issued against Kampinen.

Kampinen points out that although she gave Cho permission to look at her diary, she later told him it was personal, at which time Cho closed the diary and took it. Kampinen claims that it was a short period of time and that it was impossible for Cho to view anything "incriminating". The government asserts that the seizure of the diary was appropriate because it was in plain view at the time of the seizure and its incriminating nature was immediately apparent to the agent at that time. The plain view doctrine justifies "a warrantless search . . . if the officer has a legal right to be in the place from where he sees the object subject to seizure and 'a lawful right of access to the object itself,' and if the object's incriminating nature is 'immediately apparent.'" United States v. Berkowitz, 927 F.2d 1376, 1388 (7th Cir. 1991)(quoting Horton v. California, 496 U.S. 128, 136-37 (1990)). According to the record, Cho had a legal right to be there and was originally given permission to view Kampinen's diary. Furthermore, Cho only had to read a few words of the last entry referring to the former President's visit to raise his suspicion. Therefore, under the plain view doctrine, there was no violation of Kampinen's Fourth Amendment right.

C.  Maxwell Police Station

Kampinen was then handcuffed, arrested and taken to the Maxwell Police Station for the criminal trespass charge. After she was questioned until approximately 3:30 the next morning, Kampinen signed a "recognizance bond". As previously discussed, probable cause existed to arrest Kampinen. Therefore, there is no violation of any of her rights at the police station.

### D. Northwestern Hospital

At that point, Kampinen was again handcuffed and brought by Gould and an unknown Officer, and followed by Tilton and Cho to Northwestern for an evaluation based upon an ongoing suspicion of Kampinen being a possible threat to the former president. At the hospital, she remained handcuffed in the lobby for approximately an hour and a half. At that point, she was unhandcuffed and led back into the psychiatric ward to meet with a crisis worker and a psychiatrist. The officers and agents left. During her evaluation, the crisis worker presented a voluntary commitment form to Kampinen to sign. No police officers or Secret Service agents were present at that time. Kampinen voluntarily signed it. Kampinen now claims that her voluntary admission was done under duress. More specifically, that the agents and officers influenced the hospital personnel to persuade her to sign the form. Therefore, Kampinen alleges that the stay in the hospital constituted false imprisonment and false arrest. In addition, Kampinen later discovered that in the event that she refused to voluntarily commit herself, there was an involuntary commitment petition in her hospital file.

False imprisonment is defined as "a restraint of a person in a bounded area <u>without</u> justification <u>or consent</u>." [emphasis added]. Black's Law Dictionary 7th Ed. (1999). First, it should be noted again that the agents had probable cause to arrest Kampinen. Second, if Kampinen voluntarily checked herself into the hospital, as she did in this case, no false imprisonment could have existed because there was no unlawful detainment.

However, even assuming that Kampinen was involuntarily committed because she signed the commitment papers under duress, as she alleges, there was still no violation. "A peace officer may take a person into custody and transport him to a mental health facility when, as a result of his personal observation, the peace officer has reasonable grounds to believe that the person is subject to involuntary admission and in need of immediate hospitalization to protect such person or others from physical harm." Mental Health and Development Disabilities Act, 405 Ill. Comp. Stat. 5/3-606 (2003). Once the agents had probable cause to arrest Kampinen, they could transport Kampinen to the Northwestern's psychiatric ward and initiate the process of emergency involuntary commitment so long as the agents also had probable cause to believe that she was a threat to herself or others. See McKinney v. George, 556 F. Supp. 645 (N.D. Ill. 1983), aff'd 726 F.2d 1183 (7th Cir. 1984).

Moreover, "under Illinois law, as under federal law, the existence of probable cause is an absolute defense to an action for false arrest [and] false imprisonment." Myatt v. City of Chicago, 816 F. Supp. 1259, 1267 (N.D. Ill. 1992). In this case, because the agents reasonably believed that Kampinen may have been a threat to the former President, the officers had probable cause to transport her to a mental institution and initiate the process of emergency involuntary commitment. Thus, the agents were acting reasonably and Kampinen's claim for false imprisonment fails.

E. Kampinen's Apartment

As a general rule, warrantless searches of a residence are per se unreasonable; however, no warrant is necessary if a person gives consent for the search. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). Kampinen admits that she signed a consent form which gave permission to the officers to search her apartment during her hospital stay. In fact, Kampinen points out in her deposition that Tilton and Arndt were "extra nice" and "charming" during her visit. (Kampinen Dep. at 372.) In addition, Kampinen was present for the search and voluntarily assisted the Officers unlocking items when necessary. At no time did she ask them to leave. Therefore, there was no violation of Kampinen's Fourth Amendment rights.

III. § 1983 Claim

To succeed under a § 1983 claim, a plaintiff must prove two elements: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the activity deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. Yang v. Hardin, 37 F.3d 282, 284 (7th Cir. 1994). In this case, because none of Kampinen's rights, privileges, or immunities secured by the Constitution or laws of the United States were violated, Kampinen's claim under 42 U.S.C. § 1983 fails.

CONCLUSION

For the reasons set forth above, the Court grants Defendants James Love, Peter C. Arndt, David J. Cho and Thomas W. Tilton's Motion for Summary Judgment.

ENTER:

George M. Marovich
United States District Judge

DATED: August 18, 2003